[No. F052781. Fifth Dist. Apr. 23, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
THAVONE SOUKOMLANE, Defendant and Appellant.

**COUNSEL**

Gregory Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lloyd G. Carter, Louis M. Vasquez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GOMES, J.**—Appellant Thavone Soukomlane appeals from his conviction of willful infliction of corporal injury on a spouse and possession of controlled substance paraphernalia after a jury trial at which he represented himself. He argues that the trial court's ordering him shackled without taking precautions to keep the jury from hearing and seeing his shackles constituted an abuse of discretion requiring reversal of the judgment. Additionally, he argues that the trial court's ordering him removed from the courtroom to a back room where he could not hear part of the prosecutor's examination of a key witness against him constituted a reversible denial of his constitutional right to counsel. On both grounds, we will reverse the judgment.[1]

## FACTUAL BACKGROUND

In the wee hours of the morning of January 21, 2007, four police officers were dispatched to a motel in Tulare after Soukomlane made a "911 hang up with mention of a gun" call. After hearing a woman shout, "He's going to kill me," from a room at the motel, officers forced the door and saw Soukomlane and his wife naked on the floor, screaming unintelligibly, and blood on the curtains, the floor, and the walls. Officers characterized him as completely irrational and apparently under the influence of a controlled substance. His forearm was around her neck as if to use her as a shield against the police.

Officers separated Soukomlane from his wife, arrested him, and seized "a glass pipe usually used to smoke methamphetamine." At the hospital, his wife told the police that after smoking methamphetamine in the glass pipe he accused her of having a chip in her ear, grabbed her by the neck and choked her, and tried to pry the chip out with a set of car keys. At the hospital, he made a spontaneous comment about a chip in her ear.

## PROCEDURAL BACKGROUND

By information, the district attorney charged Soukomlane with willful infliction of corporal injury on a spouse (corporal injury) (Pen. Code, § 273.5, subd. (a))[2] and with possession of controlled substance paraphernalia (possession) (Health & Saf. Code, § 11364, subd. (a)) and alleged a corporal injury prior within the scope of both the corporal injury statute and the prison term prior statute (§§ 273.5, subd. (e)(1), 667.5, subd. (b)). A jury found him guilty as charged and found the corporal injury prior true as alleged. The trial court

---

[1] We direct the reader to the concurring opinion of Justice Cornell, *post*, at pages 235–237, for suggestions on how to handle the types of situations that confronted the trial court here.

[2] Later statutory references are to the Penal Code except where otherwise noted.

imposed an aggregate sentence of five years (the four-year middle term on the corporal injury with a corporal injury prior and the one-year enhancement for the prison term prior) and imposed no time on the possession. (§§ 273.5, subd. (e)(1), 667.5, subd. (b).)

## DISCUSSION

### 1. *Record*

Before jury selection, Soukomlane requested permission to represent himself. After admonishing him about the pitfalls of self-representation, the trial court granted his request. (See *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).) Still before jury selection, he filed a motion requesting "an order to banned my chain & leg shackles while facing trial" on the ground that "the use of chain & shackle in front of the grand [*sic*] jury is very prejudice and violated my due process right." At the hearing on the motion, likewise before jury selection, the following colloquy ensued:

"THE COURT: . . . The first motion you are making is not to be shackled in front of the jury, correct?

"THE DEFENDANT: I believe it violate my constitutional right, due process. I'm not receiving a fair trial. It's obviously outrageous and prejudicial because it limit my movement. It manifests the jury if the jury notice and make aware of my chains and shackles on my body parts. I believe that that is clearly violation of due process. I believe I should be assured a fair trial, your Honor."

"THE COURT: . . . [¶] . . . [¶] As far as the shackles are concerned, we'll see how things go. You do not have to stand up and move around while we are selecting a jury. Just remain seated. If all goes well, we'll reconsider the shackle issue.

"THE DEFENDANT: I'd like to stipulate how may I get up and address the jury, having full range body movement, if my movement is limited, your Honor?

"THE COURT: It's going to be limited because of the concerns here regarding the tenor—

"THE DEFENDANT: That don't justify any apparent good reason for my movement to be limited.

"THE COURT: They aren't going to know if you are in chains if you stand up and don't walk around. You can stand up to address the jury if you need to do so.

"THE DEFENDANT: The jury can clearly see what type—form of clothes I have, can clearly see what type of shoes I'm wearing, along with the big shackles I have on my legs. My moving up and moving and standing up, making all that noise to indicate I have chains on my foot.

"THE COURT: As I said before, we'll reconsider it after we select the jury.

"THE DEFENDANT: This is clearly prejudicial, as you know.

"THE COURT: There is a jury instruction to pay no attention to that, if we come to that point, if we ever get the jury selected and get through this procedure. I'm going to deny the motion to be unshackled at this time because, in my view, with the emotion involved here, your various outbursts at times, it's safer for all parties—

"THE DEFENDANT: I would like to have verification, any documentation to indicate and to suggest outburst, any form of disciplinary infraction or disturbance in the facility to indicate that.

"THE COURT: Let me go through that. The outbursts have been in court where you have been extremely emotional, extremely upset about the rulings I've made and/or the actions of the DA in pursuing the case.

"THE DEFENDANT: We're all human, we're all human, we're all human, your Honor.

"THE COURT: I realize that.

"THE DEFENDANT: We're entitled to emotion and feeling.

"THE COURT: Let me just finish up here. There's been no physical altercation or physical out lashing, so to speak.

"THE DEFENDANT: It's totally unfair, totally unfair. I'm not getting a fair trial. My due process is being denied. I do not have access to the tape player to review my case, to even go through my case. I strongly feel the court is rushing me.

"THE COURT: I haven't been rushing you, Mr. Soukomlane.

"THE DEFENDANT: What justification is there by rushing me out here? My court date is—my court date is one o'clock, one thirty for the hearing. I was rushed out here at five o'clock in the morning, rushing me out here, and be shackled up and subject to shackles and chains in the little courtroom. I feel it's cruel and unusual punishment. [¶] Moreover, there's no justification when I could be in my cell in the facility doing research, going through my case, making preparation. Instead, I'm being shackled and being subject—and kept in a little small tiny dungeon where I'm limited. I'm not allowed to access any legal paperwork.

"THE COURT: I have no control over when the sheriff ships you over here. Your matter was set for the pretrial. The trial is set for one thirty. I'm going to leave the bench, we'll call the jury and they should be here forthwith."

After the jury was selected, sworn, and excused, and just before opening statements to the jury, Soukomlane again sought relief from the trial court's order that he be shackled in the presence of the jury:

"THE DEFENDANT: I would like to file a motion, another motion about—bring it up to your attention about the chains and shackles on my foot. It's obvious evident the jury saw chains on my feet when I move, when I got up. And there's no wall, no barrier whatsoever to conceal from everybody that information that my foot—my feet is chained and shackled. It's very—it's a clear violation of my due process. I'm not having a fair trial. The jury gets the impression they believe I'm guilty because of the shackles on my foot.

"THE COURT: I'll give a jury instruction to them, when we go through the instructions, that they are not to—if they have noticed anything about shackles, they are not to consider that in any way, shape or form in arriving at the verdict. There's a special instruction within the jury instructions that relates to that issue. I will give that instruction to them.

"THE DEFENDANT: There's a stipulation I believe they formed an opinion that I'm guilty, your Honor.

"THE COURT: Your objection is noted and it's overruled."

After opening statements and the first witness, Soukomlane asked the trial court outside the presence of the jury to reconsider his motion not to be shackled in the presence of the jury:

"THE DEFENDANT: Your Honor, I'd like to also file a motion for reconsider, the motion for shackles on my foot and body parts. It think it's

real, real prejudicial on my case, your Honor, because I can't really stand up and make movements, so forth, because a form of moving, indicating my hands, can stimulant—can give the jury—the word I'm looking for is a lot more clearly understanding—what I'm trying to get to, the jury, by having the movements and by me shackled on my feet, it's limited my movements. I can't stand up, like the prosecution could, how she stand up and address the jury, walk around and feel a little bit confident and be able to present her case.

"As for me, I'm limited under this chair and I can't move or stand up or anything to really demonstrate my defense, to challenge the prosecution accusation. I feel like I'm not having a full due process here for examination, and so forth. Like an example, when the witness indicate blood similar to that cup, if I stand up, I could be able to get up and grab the cup, maybe present it to the witness. I could present to the witness the documentation, paperwork, whatever he need necessary, without being burden or a problem to the court.

"I can assure I'm not irrational, I'm not on no drugs or anything, I have common sense, I seem to have knowledge. And also my past history cannot indicate I am compulsive behavior. I've been incarcerated three months. I have received no disciplinary infraction or anything in the facility to indicate I'm a problem. Therefore, your Honor should give me the benefit of the doubt."

The trial court denied Soukomlane's request for reconsideration of his motion not to be shackled in the presence of the jury:

"THE COURT: . . . [¶] . . . I'm going to keep the same ruling that I had in respect to the shackles. We'll address it on a day-by-day basis. I'm confident I will give the jury instruction, I have 204, I'm going to pull that.

"THE DEFENDANT: I believe you failed to instruct the jury about my chains and shackles.

"THE COURT: They get jury instructions at the end of the case. That will be done at that time. See you all at nine fifteen."

On the next day, the trial court ordered Soukomlane removed from the courtroom during direct examination of his wife, a key prosecution witness to the charged corporal injury:

"[THE PROSECUTOR:] Q You heard the tape we just played, People's Exhibit Number 26, correct?

"[THE DEFENDANT'S WIFE]: A Yes.

"Q There's a part in there where you—

"THE DEFENDANT: Objection, your Honor, again, misleading the witness.

"THE COURT: There's no question pending. There's no question.

"THE DEFENDANT: She is about to ask the witness. I know she's trying to mislead the witness.

"THE COURT: It's overruled, Mr. Soukomlane. It's overruled.

"THE DEFENDANT: She's referring back to the tape, your Honor. The tape is not being played.

"THE COURT: The tape is being referred to. One more time you outburst, you are going in the other room. I said it before. This is the final time. Just be quiet and listen.

"(Playing the tape.)

"[THE PROSECUTOR:] This is referring to page number two and three of the transcript. Let's go back.

"(Playing the tape.)

"BY [THE PROSECUTOR]:

"Q Page three. That's you saying, 'He won't let me out. Please let me get out.' Isn't that correct?

"A No, I don't remember me saying that. It didn't sound like I was saying that.

"Q Let me play it for you one more time.

"THE DEFENDANT: Objection, your Honor.

"THE COURT: Let me give her a copy of this transcript. You can follow. It's going to start the top of page three.

"THE DEFENDANT: Clearly misleading the witness, your Honor.

"THE COURT: It's not misleading. That isn't a valid objection. Now be quiet.

"(Playing the tape.)

"BY [THE PROSECUTOR]:

"Q Does that refresh your recollection you are saying, 'He won't let me out. Please let me get out'?

"A I don't remember. If that's what it says here.

"Q That is you yelling—

"THE DEFENDANT: Objection, she's leading the witness to say something she don't understand.

"THE COURT: It's overruled.

"THE DEFENDANT: She don't recall what she said.

"THE COURT: The question is: Is that you that was on the tape making that statement?

"THE [DEFENDANT'S WIFE]: I don't remember me saying that.

"THE DEFENDANT: Objection. She can't answer it over and over. The question should be put to rest.

"THE COURT: Go ahead.

"BY [THE PROSECUTOR]:

"I'm going to show you People's Exhibit 9. People's Exhibit 9 is a set of keys. Do you recognize the keys?

"A Yeah.

"Q These were the keys that were found at the [motel] in Tulare?

"A I guess you guys found them.

"Q Are they your keys or his keys?

"A My keys.

"Q Let's go back. You said you were using crystal meth in the bathroom, is that correct?

"A Yes.

"THE DEFENDANT: Objection, your Honor, invalid. She asked the victim about using meth.

"THE COURT: Overruled.

"BY [THE PROSECUTOR]:

"Q Didn't you also tell the detective . . . that the defendant became angry and grabbed you by your neck?

"A I don't remember what I said that night. I don't remember.

"Q How long have you known the defendant?

"A Almost four years.

"Q You've been with him those four years?

"A Yes.

"Q Since this case came about, have you talked to him?

"A No, I haven't.

"Q Has he talked to you?

"A No.

"Q When you were in the hospital . . . do you remember what they did to you in there?

"A No. I just remember being there.

"Q Did they do any X-rays?

"A I just remember being there.

"Q Who is [witness's brother's name]?

"A That's my brother.

"Q Did you tell the defendant that day that you had maggots crawling all over you?

"A My husband?

"Q Uh-huh.

"THE DEFENDANT: Objection, your Honor.

"THE COURT: Overruled.

"THE [DEFENDANT'S WIFE]: That day did I tell him?

"BY [THE PROSECUTOR]:

"Q Yes. On January 21 while in the hotel room, did you tell your husband that you had maggots crawling all over you?

"THE DEFENDANT: Objection, your Honor, she asked—

"THE [DEFENDANT'S WIFE]: I didn't tell him anything.

"BY [THE PROSECUTOR]:

"Q You were just screaming?

"A I was screaming. Like I said, I was in my own world, in my own mind, out of control, out of my mind. I don't even remember half of what I said or what I did that night.

"Q Did he at any time try to stop you from digging in your ear?

"A I don't remember what he was doing. I don't know if you ever been on drugs before, but your mind is not there. I don't even recall half of the things that happened that night. My husband didn't touch me or do anything to me.

"Q He didn't touch you at all that night?

"A No, he didn't do nothing to me.

"Q Let's talk about when the officer came in this room, this is Tulare PD coming in the room. Where were you when they came in the room?

"A I was with my husband.

"Q You were with your husband. What were you doing with your husband?

"A My husband and I were holding on to each other because we didn't know who was outside. We were both scared out of our minds.

"Q How were you holding him?

"THE DEFENDANT: Objection to that, your Honor.

"THE COURT: Overruled.

"THE [DEFENDANT'S WIFE]: How was I holding him?

"BY [THE PROSECUTOR]:

"Q Yeah.

"A I was hugging him.

"Q You were facing each other?

"A Yeah.

"Q When the officers came in, what happened next?

"A They came in with guns. I remember getting down there, screaming.

"Q Did . . . your husband mention anything about—

"THE DEFENDANT: Objection, your Honor.

"THE COURT: Overruled.

"BY [THE PROSECUTOR]:

"Q Did the defendant mention anything about why were the officers there?

"A I don't know.

"Q Did you wonder why the officers were there?

"A Did I wonder why they were there?

"Q Yeah.

"THE DEFENDANT: Objection, your Honor, misleading. She stated she was out of her mind, she don't know.

"THE COURT: Overruled. Overruled.

"THE DEFENDANT: She didn't understand the question or the statement.

"THE COURT: Take him to the back room. You can sit back there and listen for a while. When you're ready to come back, quit interrupting, we'll let you back in.

"Ladies and gentlemen, the defendant has been removed from the court-room because of constantly interrupting. You are not to use this removal as evidence in any way in arriving at a decision. The reason for the removal is merely to allow the deputy DA to get through this witness and get her testimony in without constant interruption. You may proceed."

Soukomlane was outside the courtroom while the prosecutor finished her direct examination of his wife. After a brief recess, trial resumed with both the jury and Soukomlane present:

"THE DEFENDANT: Your Honor, I would like to petition the court to declare a mistrial because I wasn't present when the prosecution—

"THE COURT: We'll address that outside the presence of the jury.

"THE DEFENDANT: It's crucial that I wasn't present when the prosecution was cross-examining the witness. I feel my due process is being violated, my right to confrontation, 6th amendment, your Honor.

"THE COURT: Just be quiet. The record will reflect all the jurors are present. The defendant is present. The People are present. The witness is still on the witness stand, still under oath. Mr. Soukomlane, you may cross-examine this witness if you wish to.

"THE DEFENDANT: I have an issue, request the court for mistrial. I wasn't present when the prosecution was conduct the cross-examination of the witness.

"THE COURT: The prosecution did not cross-examine the witness. The prosecution was direct examining the witness. That is an issue that's already been dealt with. You were present for much of the time. You continued to interrupt, so I had you removed from the courtroom. [The prosecutor] finished her examination of this witness. And you are now back present and you may question this witness if you wish to.

"THE DEFENDANT: Your Honor, but I feel I'm not getting a fair trial, I declare a mistrial.

"THE COURT: You don't declare a mistrial. I declare mistrials, Mr. Soukomlane. I've got your motion, I hear what you are saying. We'll take this up outside the presence of the jury.

"THE DEFENDANT: I feel my due process been violated. I didn't have a chance to hear the question.

"THE COURT: Do you wish to ask this witness any questions or not?

"THE DEFENDANT: Yes, sir.

"THE COURT: Do it."

As ordered, Soukomlane cross-examined his wife. As soon as the trial court excused the jury for the lunch break, Soukomlane renewed his motion not to be shackled in the presence of the jury:

"THE DEFENDANT: I also have a motion. I'd like to address the court to reconsideration of the motion of my shackles and chains. Again, you indicated that it would be subject day-to-day basis. I strongly believe I'm not receiving a fair trial due to the argument earlier, me objecting—

"THE COURT: Let me get on the record—go ahead, finish up.

"THE DEFENDANT: You order me out of the room. I walked out in front of the jury. The jury noticed the chains making noise and dangling on my feet. That's totally bias and prejudicial to my case, your Honor. At this time I'd like your Honor to make discretion under the ruling—under your discretion to declare the case a mistrial.

"THE COURT: You were led from the room because you repeatedly tended to interrupt the questions by the DA's office on meaningless objections. I realize you're not an attorney and you don't know what a proper objection is. But that's one of the pitfalls of being your own attorney.

"What I did is I told you to quit making those frivolous objections because we weren't getting anywhere. The jury was becoming frustrated with your constant interruptions. I warned you several times. Ultimately you continued and I had you removed.

"Yes, you do have shackles on. And yes, I'm sure some of the jurors saw that, either saw it or heard it. And those shackles will remain on. There is a jury instruction that I will give to the jury at the end of the case regarding the shackles and that they are not to consider that in any way, shape or form in deciding the issues in this case. At this time the motion to remove the shackles is denied. We'll see you all back here at one thirty."

Soukomlane again brought the issue of shackling before the trial court outside the presence of the jury during an afternoon recess. "It's obvious they can see the chains on my feet," he argued, "Total prejudice against me, your Honor." The trial court commented, "We won't do this anymore," but otherwise was mute.

2. *Issues*

a. *Shackling in Jury's Presence*

Soukomlane argues that the trial court's ordering him shackled without taking precautions to keep the jury from hearing and seeing his shackles constituted an abuse of discretion requiring reversal of the judgment. The Attorney General argues the contrary.

■ Due process prohibits shackling noticeable by a jury unless, in the sound exercise of the trial court's discretion, case-specific concerns like "special security needs or escape risks" pose a threat to an essential state interest so as to show "adequate justification" for the shackling. (*Deck v. Missouri* (2005) 544 U.S. 622, 633, 635 [161 L.Ed.2d 953, 125 S.Ct. 2007] (*Deck*); cf. *Holbrook v. Flynn* (1986) 475 U.S. 560, 568 [89 L.Ed.2d 525, 106 S.Ct. 1340]; see also *Illinois v. Allen* (1970) 397 U.S. 337, 343–344 [25 L.Ed.2d 353, 90 S.Ct. 1057] (*Allen*).) If the requisite showing is not in the record, a trial court ordering such shackling commits an abuse of discretion, a "defendant need not demonstrate actual prejudice to make out a due process violation," and the error is reversible unless the prosecution proves beyond a reasonable doubt that the error did not contribute to the verdict. (*Deck, supra*, at p. 635, citing *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).)

Like principles are well settled in California law. First, "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the

jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290–291 [127 Cal.Rptr. 618, 545 P.2d 1322] (*Duran*).) Second, "in any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances," and a trial court should exercise discretion to use less drastic and less noticeable restraints when "safe to do so." (*Id.* at p. 291 & fn. 9.)

■ Patently, the requisite showing of an "adequate justification" or a "manifest need" is absent here. (*Deck, supra,* 544 U.S. at p. 635; *Duran, supra,* 16 Cal.3d at p. 291.) The trial court denied Soukomlane's motion on the ground that "in my view, with the emotion involved here, your various outbursts at times, it's safer for all parties—," at which point Soukomlane interjected a request for "verification, any documentation to indicate and to suggest outburst, any form of disciplinary infraction or disturbance in the facility to indicate that." The trial court acknowledged he had engaged in "no physical altercation or physical out lashing, so to speak," and stated only, "The outbursts have been in court where you have been extremely emotional, extremely upset about the rulings I've made and/or the actions of the DA in pursuing the case."

Soukomlane made a record of how, in his own words, the jury could "clearly see" not only "what type—form of clothes I have" but also "what type of shoes I'm wearing, along with the big shackles I have on my legs. My moving up and moving and standing up, making all that noise to indicate I have chains on my foot." Neither the trial court nor the prosecutor disputed his statement. Shortly afterward, he made an additional record of how, again in his own words, his shackles were noticeable by the jury: "It's obvious evident the jury saw chains on my feet when I move, when I got up. And there's no wall, no barrier whatsoever to conceal from everybody that information that my foot—my feet is chained and shackled." As before, neither the trial court nor the prosecutor disputed his statement. The trial court simply noted that the charge to the jury was to include an instruction "not to consider that in any way, shape or form in arriving at the verdict."

Later, asking the trial court to reconsider his motion not to be shackled in the presence of the jury, Soukomlane made a record of how he had "been incarcerated three months" and had "received no disciplinary infraction or anything in the facility to indicate I'm a problem." Once again, neither the trial court nor the prosecutor disputed his statement.

Yet later, Soukomlane made an additional record of how the jury saw and heard his shackles: "You order me out of the room. I walked out in front of the jury. The jury noticed the chains making noise and dangling on my feet."

Confirming his statement, the trial court replied, "Yes, you do have shackles on. And yes, I'm sure some of the jurors saw that, either saw it or heard it. And those shackles will remain on." In his own defense, he testified, "It's obvious to the grand [*sic*] jury, I'm not going to lie, I'm incarcerated, I got chains on my feet." Just before deliberations, the trial court instructed: "The fact that physical restraints have been placed on the defendant is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."

■ The Attorney General argues that Soukomlane's pending charge and prior for corporal injury support the trial court's ruling denying his motion not to be shackled in the presence of the jury. To the contrary, our Supreme Court emphasizes "that it is manifest that the shackling of a criminal defendant . . . charged with any crime"—"particularly," as was Soukomlane, with "a violent crime"—"will prejudice him [or her] in the minds of the jurors" since one's "appearance before the jury in shackles is likely to lead the jurors to infer that he [or she] is a violent person disposed to commit crimes of the type alleged." (*Duran, supra*, 16 Cal.3d at p. 290, citing *Allen, supra*, 397 U.S. at p. 344.)

■ Equally meritless is the Attorney General's argument that since the trial court instructed on shackling "it is presumed that any inferences the jurors may have drawn about [him] after finding out he was being restrained during trial had no bearing on their decision to convict him." A shackling instruction, in words the United States Supreme Court used in a different context, is "not 'some talisman that dissolves all constitutional protections.' " (*Butterworth v. Smith* (1990) 494 U.S. 624, 630 [108 L.Ed.2d 572, 110 S.Ct. 1376].) With or without an instruction, shackles "should be used as a last resort not only because of the prejudice created in the jurors' minds, but also because 'the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' " (*Duran, supra*, 16 Cal.3d at p. 290, citing *Allen, supra*, 397 U.S. at p. 344.)

Additionally, the Attorney General argues that a pretrial colloquy between the trial court and Soukomlane justifies his shackling at trial. At that hearing, the trial court set bail for his wife at $75,000 after she was apprehended just before "hopping a plane and going back to the east coast." Soukomlane characterized that as "frightening the witness by keeping her in custody." The trial court replied he had no standing to assert "any rights on behalf of [her]" since she was "a witness against you." Soukomlane argued, "I have a right to

address the court" with "my side of the story." The trial court rejoined, "I heard your side of the story." Soukomlane replied, "You ordered it before you even heard my side of the story, your Honor." The trial court stated, "Mr. Soukomlane, you have no side of the story. You don't have standing." He asked, "If I have no standing, why am I here appearing before you?" The trial court replied, "I wanted you to overhear the process we went through." He answered, "My overhearing that relate to me, your Honor, that affect me and my case." The trial court retorted, "Get out of here."

The Attorney General argues that Soukomlane's words in the pretrial colloquy constitute "other noncomforming conduct" that justifies his shackling as a sound exercise of the trial court's discretion. (*Duran, supra,* 16 Cal.3d at p. 291.) Our Supreme Court elucidates, however, that only if other noncomforming conduct " 'disrupts or would disrupt the judicial process if unrestrained' " is shackling *not* an abuse of a trial court's "relatively narrow" discretion. (*People v. Cox* (1991) 53 Cal.3d 618, 651 [280 Cal.Rptr. 692, 809 P.2d 351], quoting *Duran, supra,* at p. 292, fn. 11.) The trial court granted Soukomlane's *Faretta* motion just two days before the pretrial hearing at which he was predictably ill prepared on the law and understandably emotional about the trial court's setting bail high enough to incarcerate his wife until she finished testifying at trial. His shackling was neither "a last resort" nor a response to actual or threatened disruption of the judicial process but a lamentable casualty of the trial court's impatience with his exercise of the constitutional right to self-representation. (Cf. *Allen, supra,* 397 U.S. at p. 344; *Duran, supra,* 16 Cal.3d at p. 290.)

Throughout trial, Soukomlane's shackles were evident to the jury, even as he testified in his own defense that after smoking methamphetamine he hallucinated and felt paranoid. Consistently, his wife testified that after she smoked methamphetamine she "was in my own world, in my own mind, out of control, out of my mind." His defense challenged the element of *willfulness* in the charge of *willful* infliction of corporal injury and sought to offset the evidence of her inconsistent statements on the night at issue.

The case law is muddled as to the applicable standard of review, but since the trial court's order denying Soukomlane's motion not to be shackled in the presence of the jury constituted a prejudicial abuse of discretion not only by the federal constitutional standard (*Deck, supra,* 544 U.S. at p. 635, citing *Chapman, supra,* 386 U.S. at p. 24; cf. *People v. Mar* (2002) 28 Cal.4th 1201, 1225, fn. 7 [124 Cal.Rptr.2d 161, 52 P.3d 95]) but also by the ordinary state law standard (*Mar, supra,* at p. 1225, citing *People v. Watson* (1956) 46 Cal.2d 818, 836–837 [299 P.2d 243]), we need not lower our oars into those troubled waters. In no small measure, his defense depended on how jurors perceived his credibility during his testimony, but since those perceptions were highly

vulnerable to the impact of seeing him in shackles, the trial court's abuse of discretion requires us to reverse the judgment. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 746 [71 Cal.Rptr.3d 845].)

      b.   *Removal from Courtroom*

Soukomlane argues that the trial court's ordering him removed from the courtroom to a back room where he could not hear part of the prosecutor's examination of a key witness against him constituted a reversible denial of his constitutional right to counsel. The Attorney General argues that error, if any, was harmless beyond a reasonable doubt.

█ The rule is settled that the Sixth Amendment right to counsel "is one of the rights of due process which are necessary to insure the fundamental human rights to life and liberty. If this safeguard is not provided, justice cannot be done. The state is without the power and authority to deprive an accused of life and liberty unless he [or she] has or waives assistance of counsel, and provision of the right to counsel, or waiver thereof, is an essential jurisdictional prerequisite to the authority to convict an accused. Conviction without this safeguard is void." (*People v. Carroll* (1983) 140 Cal.App.3d 135, 141 [189 Cal.Rptr. 327] (*Carroll*), citing *Johnson v. Zerbst* (1938) 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019].) The right to counsel is one of the "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." (*Chapman, supra*, 386 U.S. at pp. 23 & 24, fn. 8, citing *Gideon v. Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792].)

Seeking to distinguish *Carroll*, the Attorney General observes that the *Faretta* defendant in that case "was completely excluded without any opportunity to hear what happened in his absence" and argues, "That is not true in the present case." The record belies his argument. On Soukomlane's motion for a mistrial after the trial court removed him from the courtroom during part of the direct examination of his wife, he emphasized, "I wasn't present when the prosecution—," but the trial court interjected, "We'll address that outside the presence of the jury." He insisted, "It's crucial that I wasn't present when the prosecution was cross-examining the witness," but the trial court admonished him, "Just be quiet." He reiterated, "I have an issue, request the court for mistrial. I wasn't present when the prosecution was conduct [*sic*] the cross-examination [*sic*] of the witness," but the trial court replied, "That is an issue that's already been dealt with. You were present for much of the time. You continued to interrupt, so I had you removed from the courtroom. [The prosecutor] finished her examination of this witness. And you are now back present and you may question this witness if you wish to." Ignoring his entreaty, "*I didn't have a chance to hear the question,*" the trial

court retorted, "Do you wish to ask this witness any questions or not?" Neither the trial court nor the prosecutor disputed his statements.

Later, the trial court articulated for the record the reason for ordering Soukomlane removed from the courtroom: "You were led from the room because you repeatedly tended to interrupt the questions by the DA's office on meaningless objections. I realize you're not an attorney and you don't know what a proper objection is. But that's one of the pitfalls of being your own attorney." Commendably, the Attorney General makes no attempt to justify the indefensible notion that "one of the pitfalls" of self-representation is the Hobson's choice of altogether forfeiting cross-examination, or conducting cross-examination without having heard part of the prosecutor's examination, of a critical witness.

■ As *Faretta* notes, a trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct" and "may—even over objection by the accused—appoint a 'standby counsel' to," inter alia, "represent the accused in the event that termination of the defendant's self-representation is necessary." (*Faretta, supra,* 422 U.S. at p. 835, fn. 46.) In *Carroll,* the trial court erred by removing the defendant from the courtroom, conducting portions of the trial in his absence for "annoying, provocative, and somewhat disruptive" conduct, and failing to appoint standby counsel to represent him in his absence. (*Carroll, supra,* 140 Cal.App.3d at pp. 137, 143.) "Such a situation offends the most fundamental idea of due process of law, as defendant is totally deprived of presence at trial and even of knowledge of what has taken place. Because defendant represented himself, his removal from the courtroom deprived him not only of his own presence, but of legal representation." (*Id.* at p. 141.) *Carroll* held that "the involuntary exclusion from the courtroom of a defendant who was representing himself, without other defense counsel present, was fundamental error requiring reversal without regard to prejudice." (*Id.* at p. 142.) Soukomlane urges us to do the same.

In reliance on *People v. El* (2002) 102 Cal.App.4th 1047 [126 Cal.Rptr.2d 88] (*El*), the Attorney General urges us to apply the harmless error standard instead. In *El,* the trial court removed a *Faretta* defendant from the courtroom during part of the prosecutor's opening statement without appointing standby counsel to represent him in his absence. (*Id.* at p. 1049.) On appeal, he conceded he improperly disrupted the opening statement but argued fundamental error requiring reversal without regard to prejudice. (*Id.* at pp. 1049–1050.) Observing that the defendant "did not miss any testimony" and that nothing in the prosecutor's opening statement was "objectionable," *El* held that the error was harmless beyond a reasonable doubt. (*Id.* at p. 1051.) The Attorney General argues that "there was nothing objectionable about the questions asked during [Soukomlane's] absence."

The Attorney General's attempt to analogize the record here to the record in *El* fails to persuade us. Appellate analysis of part of an opening statement for possible impropriety is a simple enough task. Appellate analysis of a defendant's absence from part of the prosecutor's examination of a critical witness is not. Soukomlane and his wife were the sole percipient witnesses to the events before the 911 call and the arrival of police. We decline the Attorney General's tacit invitation to substitute our reading of a reporter's transcript for a *Faretta* defendant's hearing and seeing all of the complexities, nuances, and subtleties (with reference to content and credibility alike) of the prosecutor's examination of the only other percipient witness to the events at the heart of the charge against him.

Since we cannot declare our belief that the denial of Soukomlane's constitutional right to counsel was harmless beyond a reasonable doubt, we will reverse the judgment on that ground. We need not address the question whether the error requires reversal per se.[3]

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial or for such further proceedings as may be just under the circumstances. (§ 1260.)

Vartabedian, Acting P. J., concurred.

**CORNELL, J.,** Concurring.—I agree completely with the opinion of my colleagues. I write separately to suggest steps a trial judge could consider when faced with the difficult circumstances presented by a propria persona defendant in a felony case.

First, appoint standby counsel, not cocounsel or advisory counsel. The appointment should be made at the time propria persona status is granted. Standby counsel should be prepared to substitute in at any time. This means that standby counsel should receive all discovery and attend all hearings. Having standby counsel allows the trial judge to control a disruptive defendant by terminating his or her propria persona status and continuing with the hearing or trial. This suggestion may be resisted as too expensive. But, for example, had it been done here, the time and expense of a new trial may have been avoided.

---

[3] Nor, in deference to the common law doctrine of ripeness, need we address Soukomlane's argument that his request for immediate sentencing did not constitute an effective waiver of his right to a probation report. (*Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1722 [45 Cal.Rptr.2d 752]; *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618]; see *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 65, fn. 6 [2 Cal.Rptr.2d 389, 820 P.2d 613].)

Second, do not shackle a propria persona defendant. At the time propria persona status is granted, the trial judge should explain to the defendant the conduct expected in the courtroom. This could include admonitions about interrupting or acting out. The defendant should be told that his or her right to self-representation could be forfeited by disruptive conduct. Also, tell the defendant that if the disruptive conduct continues after standby counsel is substituted into the case, the defendant will be removed from the courtroom and the hearing or trial will proceed. The defendant's conduct will determine whether he or she remains in the courtroom.

Third, at the beginning of each hearing and the trial, explain to the defendant the procedure that is going to be followed. This should include telling the defendant which side will go first, when and how to object, and not to interrupt. Emphasize to the defendant that his or her conduct determines whether propria persona status continues. Provide the defendant with a pen and a notepad. One method that some trial judges use is to tell the defendant to raise his or her hand when he or she wants to object or address the court.

Fourth, make a clear record. If you are in a jury trial, do this outside the presence of the jury. If termination of propria persona status is being considered, describe the offending conduct for the record unless it is clear without a description. Warn the defendant that continued misconduct will result in the forfeiture of his or her propria persona status. If, after the substitution of standby counsel, the defendant continues to act out, warn the defendant that his or her conduct will result in the forfeiture of his or her right to be present in the courtroom during the hearing or trial. Let the defendant know that continued disruption of the proceedings will not result in a mistrial or a delay in the proceedings.

Fifth, if the defendant is removed from the courtroom, tell his or her attorney on the record that the defendant can return to the courtroom when he or she agrees not to disrupt the proceedings. If you are in a jury trial, have the attorney consult with the defendant at each noon and evening recess to determine whether he or she agrees not to be disruptive, and on the record have the attorney confirm that the discussion took place and how the defendant answered. Tell the jury when it returns to the courtroom that the defendant has chosen not to be present during the proceedings. Do not elaborate.

Finally, consult with your colleagues about their experiences and suggestions. There is a wealth of experience to draw from, so take advantage of it.