Filed 7/16/14  P. v. Carnes CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE, | C071147 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F11757) |
| v. | |
| ARTHUR CHARLES CARNES, | |
| Defendant and Appellant. | |

A jury found defendant Arthur Charles Carnes guilty of first degree murder and found he personally and intentionally used and discharged a firearm, causing death.  (Pen. Code, §§ 187, subd. (a), 12022.5, subd. (a)(1), 12022.53, subds. (b)-(d).)  The trial court sentenced him to prison for 50 years to life, and he timely appealed.  On appeal, defendant challenges physical restraints imposed on him during the trial.  We find no error regarding the trial court's restraint orders, and alternatively find any error harmless beyond a reasonable doubt.  We shall affirm.

1

## FACTS

The facts of the crime are not disputed on appeal.

*People's Case*

Defendant lived in a shed on Matthew Seybert's Galt property, and worked for him, although they often argued. Defendant mentioned killing his enemies, and threatened Seybert in a barn on the property. Defendant showed Timothy Milano his AK-47 assault rifle, and said he knew how to knock people out with chloroform. On November 17, 2007, Seybert told a friend he was going to move and not take defendant, and he expected defendant to be very upset by this news. On November 22, 2007, Milano went to Seybert's home and found "a ghost town," with Seybert's medications and computer equipment missing.

On December 4, 2007, peace officers found a bullet hole in Seybert's bloody bedroom. Later, they found his severed head and body parts on the property. Seybert's body had been stabbed more than 20 times, and he was partly emasculated. Earlier, officers found Seybert's bank statement in the shed defendant used, and later defendant made five $500 ATM withdrawals from Seybert's account, at banks in Oregon, Washington and British Columbia.

On January 26, 2008, the Royal Canadian Mounted Police (RCMP) found an AK-47 assault rifle in defendant's bedroom in British Columbia, Seybert's bank cards and watch, and a camera with images of Seybert bound, then decapitated and dismembered. Seybert's blood was on a bullet in the wall of his bedroom, which had been fired from defendant's rifle.

A woman testified that in 1991, defendant knocked her out with chloroform and she woke up to find herself tied up as defendant dragged her across a basement.

2

*Defense Case*

Defendant, acting as his own attorney, recalled Milano, to try to highlight inconsistencies in his story. Defendant also called his investigator, who identified photographs of a barn that he took in 2012 and described its features (but readily conceded on cross-examination that he did not know what the barn looked like in 2007). He also called a munitions expert who described a website defendant created, that was devoted to improvised weapons, poisons and explosives, and who opined defendant "has a pretty good grasp of improvised munitions, improvised terror devices. I would say a very broad base [*sic*] knowledge of all manner of unconventional warfare."

During his closing argument, defendant admitted the 1991 incident, admitted his gun was the murder weapon, and admitted using Seybert's bank card on the way to Canada, but argued he was too clever to leave such a trail--by not hiding his identity when using the ATMs and not altering or destroying the gun--if he had actually killed Seybert. Defendant highlighted alleged inconsistencies in the evidence, and suggested that Milano, who had admitted firing defendant's AK-47 in the past, actually killed Seybert. Although confined to his chair for the duration of trial due to the disputed order, defendant frequently referred to specific exhibits, which were displayed to the jury by either a bailiff or court attendant, at his direction, during both trial and argument.

The jury convicted defendant as charged, of first degree murder, and of personally and intentionally discharging a firearm, causing death.

## DISCUSSION

Defendant challenges only that portion of the trial court's order regarding extra courtroom security measures that affected defendant's movement during the trial. We find no error, and alternatively find any error was harmless beyond a reasonable doubt.

3

# I

## *Security Ruling*

The Sacramento County Sheriff's Department sought special security measures at the start of defendant's pro per trial, including extra personnel in and out of the courtroom, searches of members of the public entering the courtroom, explosive detecting dogs, and securing the jury. It made this request due to defendant's knowledge of improvised weaponry, including explosives and chemical weapons, his status as the administrator of anti-government websites, the fact he had "followers" on such sites with access to weapons who had communicated with defendant using coded messages while he was in jail. Further, a plastic knife "and other suspicious items" had been sent to defendant and he had expressed an apparent intent to escape.

The trial court held several hearings and issued a 19-page ruling, with numerous attachments, finding "an overriding security risk" justified such measures. Pertinent points include:

1. The trial court found defendant held anti-government beliefs and was skilled in improvised weaponry and violent crime. Defendant admitted he had been the administrator of a website devoted to "the manufacturing of weapons of every variety" and "how to communicate in code." The website was a "cookbook on how to do harm which, although potentially 12 years old, is quite frightening. The site further expresses the defendant's belief that the public should fight the government generally and law enforcement specifically through underground means because the government is destroying the public's constitutional rights and militarizing the police in preparation for dictatorship." Indeed, defendant testified at a hearing regarding escape risk: " '[I]f I was going to do something, given my skills and knowledge about improvised weaponry and all this other stuff, surely, if I had intended to, I could have made a weapon at any point in the past.' "

4

2.  Defendant had an online following in the anti-government community that had been "actively following his trial."  Two "potential followers" had communicated with him in code while he had been in custody, and commentators on several anti-government online fora had been actively discussing his trial.

3.  Defendant communicated in code with people outside jail, and some messages discussed explosives and the radios the sheriff's department uses, and a person who sent defendant a box containing knives and other dangerous material was an ordinance expert who worked at Camp Pendleton, testing munitions.

4.  The RCMP found a knife in defendant's cell before he was extradited.  The box sent to the Sacramento jail by one of his followers contained a metal double-bladed knife and a non-metallic double-bladed knife "which was not detectable when the box was examined at the Court's magnetometer."  The box also had information on weaknesses in body armor that could apply to the armor worn by courtroom deputies.

5.  Defendant possessed a digital camera while in jail, and "acknowledged that the camera could be broken down to make a detonator but claimed it was missing the explosive components to make [a] bomb[.]"

6.  Defendant was sent "bricks" of a substance that the Sheriff's Explosive Ordinance Detail determined was flammable.

7.  Defendant indicated that he would try to escape, both to the RCMP before extradition, and while using the jail law library.

Further, no alternatives had been suggested by defendant, who voiced no objection to the extra measures so long as the jury was not made aware of them.

These same points informed and supported the trial court's decision to order that the defendant remain seated in his chair during trial.  Attached to the security order were transcripts of four hearings held which in part addressed the physical restraints requested by the sheriff's department.

On January 26, 2012, defendant was described as "belly chained and shackled" to his chair, and the security officer asked that "maximum restraints" be used at trial. Defendant claimed the knives were relevant to his defense because the evidence would show he "habitually" wore similar knives, which were not consistent with the wounds to Seybert as described by the coroner. He claimed the articles on killing and chloroform that had been sent were stale, and in any event were relevant to his defense, as well as the "bricks" of material, which could be used to model "wound ballistics and military law enforcement testing regarding . . . knives and blunt trauma." He objected to restraints because "surely the DA is going to be getting up approaching the jury box, the witnesses, approaching evidence table, handling exhibits, et cetera. And then there would be me, the defendant, hiding behind a desk never being seen to rise or to approach or handle any of the exhibits. [¶] And, ah, the jurors are not going to be stupid[,]" but would realize defendant was restrained.

The trial court found that although some of defendant's contentions in isolation might be plausible, the totality of the record showed a manifest need for physical restraints. The restraints would not be visible to the jury, and the prosecutor was ordered not to stand when the jury entered or left the courtroom, but would be permitted to stand when questioning prospective jurors during voir dire and witnesses during trial. The trial court gave defendant the choice whether it would admonish the jury about defendant having to remain seated, and defendant asked for time to think about that, which was granted. Defendant also asked to be allowed to stand while wearing a stun belt, during closing arguments, and that issue was deferred, with defendant's concurrence.

On January 31, 2012, after additional information was presented, defendant contended his comment to the RCMP had meant he was fighting extradition, not that he would try to escape, and the knife the RCMP found was not his. He added that if he had wanted to avoid trial in the United States, he had had ample opportunity to kill someone while in jail in Canada and remain there for trial. He denied receiving or sending coded

6

messages. At that point the trial court indicated it probably would *not* allow him to stand for closing arguments, and reiterated that defendant could choose whether the trial court would admonish the jury about restraints. The court repeated that although defendant had some individually plausible explanations for some of the evidence, the totality of the evidence showed he presented a manifest danger requiring restraint, including his knowledge of poisons and explosives, how to evade the police, how to use codes, how to pick locks and overcome magnetic doors, and how to knock people out with chemicals. Further, the box containing the knives, and "bricks" of flammable material and instructions on how to attack an officer wearing body armor, had been delivered to defendant "with the cloak of attorney-client work-product kind of protection." The trial court also discussed certain cases regarding whether the prosecutor should be similarly limited, (see *People v. Burnett* (1980) 111 Cal.App.3d 661 (*Burnett*); *People v. Slaughter,* 2005 Cal. App. Unpub. LEXIS 11822 (Dec. 21, 2005, C045623) [nonpub. opn.]), and adhered to its ruling that the prosecutor would only be limited to his chair during introductions and when the jury entered and left the courtroom.

Defendant elected to have the trial court admonish and voir dire the jury about his need to remain in his chair, but not about the courtroom security. The trial court later described the admonishment as follows: "I advised them during the jury selection process that as a pro per defendant who was in custody, he would have to stay in the chair. Obviously, there was no reference to restraints of any kind. [¶] I don't believe the jury knows that he was restrained physically. I think they would assume he was restrained by order, which of course he was as well." During voir dire the trial court told the venire that because defendant was in custody "and even though he is representing himself, as is customary, I have ordered that he remain in this chair," and he asked jurors if they could follow the admonition not to hold that against defendant, and still apply the presumption of innocence.

7

On February 8, 2012, the trial court again summarized the reasons for imposing extraordinary in-court security measures. On March 12, 2002, it issued its written ruling.

## II

### *Analysis*

On appeal, defendant contends primarily that because he was representing himself, his inability to stand or move about the courtroom as freely as the prosecutor, particularly during closing arguments, undermined the fairness of the proceedings. We disagree.

### *Restraints and Abuse of Discretion*

"No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge." (Pen. Code, § 688.) Based on "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand," our Supreme Court has reaffirmed the rule "that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291 (*Duran*).)

The decision to shackle a defendant is within the discretion of the trial court and will be upheld by a reviewing court in the absence of an abuse of discretion. (*People v. Cunningham* (2001) 25 Cal.4th 926, 987 (*Cunningham*).) "We normally review a trial court's ruling based on the facts known to the trial court at the time of the ruling." (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [trustworthiness of statement]; see *People v. Welch* (1999) 20 Cal.4th 701, 739 [*Faretta* motion]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1287 [severance motion].)

"The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Duran*, *supra*, 16 Cal.3d at p. 291.)

8

Here, the trial court clearly was permitted to impose extra security measures. The evidence before it showed defendant posed a definite threat to court personnel and was at high risk for escape. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1270-1271 [possession and attempted use of makeshift handcuff key; "It was reasonable for the court to conclude from this evidence that defendant had been caught attempting to help another inmate escape, and possibly attempting to escape himself"]; *People v. Gamache* (2010) 48 Cal.4th 347, 369–370 [Gamache found with a homemade handcuff key, properly deemed a flight risk]; *People v. Livaditis* (1992) 2 Cal.4th 759, 774 ["The information regarding the possible escape plans, together with defendant's history of prior escape attempts, was a sufficient basis for the temporary leg brace"]; *People v. Stankewitz* (1990) 51 Cal.3d 72, 95-97 [Stankewitz had attempted to escape and engaged in violent conduct; properly restrained].)

Nor is conduct supporting shackling limited to escapes or acts of violence in the courtroom. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944.) In *Hawkins*, Hawkins fought three times in prison--the fights and his extensive criminal history were sufficient to justify shackling. (*Ibid*.) In *Cunningham*, *supra*, 25 Cal.4th at page 988, the court properly ordered restraints despite Cunningham's largely non-violent conduct. Here, defendant sent and received coded communications, and received a box containing knives, flammable material, and information about how to defeat body armor. Added to that, the trial court could consider the nature of the killing and dismemberment, defendant's flight to Canada, his possession of a knife in a Canadian jail, and his statements indicating his intent to escape, all of which show extra security and physical restraints were manifestly necessary.

Defendant argues about the relevance or value of some of the supporting evidence, drawing alternative inferences with less evidentiary worth from his statements, and minimizes the likelihood that he could actually manufacture an explosive device or escape. However, on appeal, we construe the evidence in the light most favorable to the

9

trial court's *factual* rulings, and then measure them against applicable legal standards, in order to determine whether an abuse of discretion has been shown. (See *People v. Cluff* (2001) 87 Cal.App.4th. 991, 998.) Defendant's factual quibbles do not show error.

A concurring opinion in *People v. Soukomlane* (2008) 162 Cal.App.4th 214, relied on by defendant (but inexplicably not even cited by respondent) suggests steps a trial court may take when confronted with a difficult self-represented defendant, the second of which is "do not shackle a propria persona defendant." (*Id.* at pp. 235-236 (conc. opn. of Cornell, J.).) We certainly agree a defendant's self-represented status is a factor the trial court should consider, but we disagree that status imposes an absolute prohibition on restraints in such cases.

The remedy chosen by this court was a sensible compromise: The jury was told defendant was not allowed to leave his chair due to a court order triggered by defendant's custody status, and during voir dire the jurors indicated this would not affect their application of the presumption of innocence; defendant was allowed to question witnesses and refer to exhibits with the aid of court personnel, and allowed to make his closing argument, without the jury being distracted or prejudiced by seeing that he was shackled. The trial court followed the rule that "where physical restraints are used those restraints should be as unobtrusive as possible, although *as effective as necessary* under the circumstances." (*Duran*, *supra*, 16 Cal.3d at p. 291, emphasis added.)

As defendant points out, the prosecutor was allowed to stand to question witnesses and make arguments--but not allowed to stand when the jury entered or left the courtroom--whereas defendant was not. But the reason for this different treatment was explained to the jury as resulting from defendant's custody status; there is no evidence that the jury was inclined to speculate that he remained seated for any other reason than that given by the trial court. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions"].)

10

In *Burnett*, *supra*, 111 Cal.App.3d 661, the reasons stated by the trial court for using leg chains on a self-represented defendant on trial for four robberies--consisting of a seven-year-old escape conviction, and a prior first degree murder conviction for which Burnett was then serving a life sentence--were found wanting by the appellate court. The *Burnett* court concluded the escape conviction was too stale, and that the murder conviction and sentence, and current charges, were insufficient to require shackling, where the prosecutor conceded Burnett had behaved appropriately during the proceedings. (*Id*. at pp. 664-668.) *Burnett* found an abuse of discretion, classifying physical restrictions similar to those imposed in this case as "unnecessary restriction on [defendant's] efforts to represent himself" and "unwarranted additional restraint" to the "limitations inherent in self-representation." (*Id*. at p. 669.) We find *Burnett* distinguishable on the facts and unpersuasive on the law.[1]

Here, unlike in *Burnett*, the prosecutor did *not* concede defendant behaved well during the proceedings, and the detailed pretrial ruling shows otherwise, as we explained *ante*. Therefore, putting aside *Burnett*'s highly dubious conclusions that a seven-year-old escape conviction was too "stale" to be a valid consideration, and the fact that Burnett was already a convicted murderer serving a life sentence was insufficient to justify restraints, *Burnett* is distinguishable given defendant's concerning behavior here.

Further, even if we assume error in restricting defendant's movement, and further assume, without deciding, that the error was of federal constitutional dimension, we hold any error harmless beyond a reasonable doubt. Defendant relies on the rule that, "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due

_____

[1] Inexplicably, defendant did not mention *Burnett* until the reply brief, although it was discussed by the trial court, and inexcusably the Attorney General does not address it at all.

process violation.  The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' " (*Deck v. Missouri* (2005) 544 U.S. 622, 635 [161 L.Ed.2d 953, 966], quoting *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705].)  This court has described the test for the *Chapman* standard as follows:  "To find the error harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on the issue in question." (*People v. Song* (2004) 124 Cal.App.4th 973, 984; see *Yates v. Evatt* (1991) 500 U.S. 391, 403-404 [114 L.Ed.2d 432, 448-449].)

Here we are able to make the required finding without pause.  The evidence that defendant murdered Seybert is such that it is clear to us beyond a reasonable doubt that the restrictions on defendant's movement did not contribute to the verdict.  Seybert was going to evict defendant and knew that would make defendant angry.  Defendant's assault rifle was used to kill Seybert, and defendant used Seybert's bank cards to withdraw cash while fleeing to Canada, where he was captured in possession of the murder weapon *and a digital camera depicting the murder and dismemberment in stages*.  No plausible third-party culpability evidence was developed at trial, given that Milano had no apparent motive to kill Seybert, and did not flee with the murder weapon, use Seybert's bank cards on the way to Canada, and retain digital images of the crime in its various gruesome stages, as did defendant.  It is likely defendant's theory that he was too clever about weapons and ATM cameras to get caught harmed his defense, rather than bolstered it.  In such circumstances, any error was harmless beyond a reasonable doubt.

**DISPOSITION**

The judgment is affirmed.

                                                                         _____DUARTE_____, J.

We concur:

_____RAYE_____, P. J.

_____MURRAY_____, J.

13