Filed 11/21/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAFAEL RAMOS,<br><br>    Defendant and Appellant. | B248512<br><br>(Los Angeles County<br>Super. Ct. No. VA125672) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Reversed.

    Heather Washington, under appointment by the Court of Appeal, for Defendant and Appellant.

    Kamala D. Harris, Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Lance E. Winters, Senior Assistant Attorney General; Victoria B. Wilson, Supervising Deputy Attorney General; and Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

_____

Rafael Ramos was charged with making criminal threats against Nancy Garcia, and elected to represent himself at trial. Prior to opening statements, the trial court removed Ramos from the courtroom for disruptive conduct. No standby counsel was appointed to represent him in his absence. During Ramos's period of exclusion, the prosecution presented its opening statement and conducted a direct examination of Garcia. Ramos was then permitted to return to the courtroom and participate in the remainder of trial. The jury found him guilty.

On appeal, Ramos argues that: (1) the court violated his Sixth Amendment right to counsel when it involuntarily excluded him from the courtroom without appointing substitute counsel; and (2) the error requires automatic reversal. We agree, concluding that the denial of counsel during the testimony of a key witness is a per se Sixth Amendment violation that requires reversal without analysis for prejudice or harmless error. We therefore reverse the judgment, and remand for a new trial.

**FACTUAL BACKGROUND**

A.      *Summary of the Information and Preliminary Hearing*

On August, 21, 2012, the County of Los Angeles District Attorney filed a two count information against Rafael Ramos alleging that he burglarized the residence of Nicole Eimer (see Pen. Code, § 459)[1], and made criminal threats against her. (See § 422, subd. (a).) The information also alleged Ramos had suffered a prior prison term within the meaning of section 667.5, subdivision (b).

At the preliminary hearing, Eimer testified that she had been in a relationship with Ramos that ended in June of 2012. According to Eimer, at approximately 1:00 p.m. on July 12, 2012, Ramos approached an open window on the side of her house and began screaming her name. Ramos then reached his arm inside the window, punched through a screen and grabbed her arm. While grasping her arm, Ramos told Eimer he was going to kill her, causing her to fear for her life.

---

[1]      Unless otherwise noted, all further statutory citations are to the Penal Code.

Eimer's next door neighbors, Ruth and Nancy Garcia, also testified at the preliminary hearing. Ruth testified that at approximately 1:00 p.m. on July 12, 2012, she was standing in her driveway with Nancy (Ruth's sister) when she noticed Ramos sitting on a couch on Eimer's porch. Ruth stated that Ramos was drinking alcohol, and began "hitting on" Nancy. When Nancy refused to respond to him, Ramos stood up, walked toward her and threatened to "fuck her up." Ramos then walked back toward Eimer's house, stuck his hand through an open window and began swearing at a person inside the house.

Nancy Garcia provided similar testimony, explaining that she went outside her house on the afternoon of July 12th, and saw Ramos sitting on her neighbor's porch. According to Nancy, Ramos began "hitting on" her. After Nancy refused to respond, Ramos stood up, walked toward her and told her she was acting conceited. Nancy asked Ramos to stop speaking to her. Ramos then "got aggressive," telling Nancy she needed to mind her own business, that this was "his city" and that he was going to "fuck [her] up." Ramos walked back toward Eimer's house, put his hand through an open window and began arguing with someone inside the house. The police arrived shortly thereafter.

Several months after the preliminary hearing, the district attorney filed an amended information that added a third count alleging Ramos had made criminal threats against Nancy Garcia. (§ 422, subd. (a).)

### B. Trial Court Proceedings

Prior to trial, Ramos made three separate "*Marsden* motions" (see *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*)) requesting appointment of substitute counsel. The trial court denied each request. On the morning the trial was scheduled to begin, which was the last day of Ramos's statutory speedy trial period, the district attorney informed the court she had recently received recordings of numerous conversations between Ramos and Eimer that had occurred while the defendant was in custody awaiting trial. The district attorney explained that at least one of the recordings indicated that Ramos had instructed Eimer "how she should or should not be testifying." Ramos's appointed counsel, Barbara McDaniel, told the court that although she had been prepared

3

to start trial that day, she would now need time to review the newly-acquired recordings. Ramos, however, informed that court that he was tired and wanted to start the trial immediately. He also stated that he wanted to "fire" McDaniel, and receive a new "public defender." The court held a fourth *Marsden* hearing, and denied the request. Immediately after the court made its ruling, Ramos stated that he wanted to "go pro per then."

The court instructed Ramos to fill out a "*Faretta* form" (see *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*)) acknowledging that he intended to waive his right to counsel. The court also informed Ramos that if it granted him "pro per status," the trial would start that day, and he would be expected to adhere to all the rules of court. Ramos then asked for a one-week continuance to prepare for trial. The court explained that was not possible because Ramos had refused to waive his speedy trial rights. Ramos then confirmed that he did not want to waive his speedy trial rights, that he wanted to represent himself in the proceedings and that he was prepared to begin trial that day. After finding that Ramos had made a "voluntary, knowing and intelligent waiver of his right to have an attorney represent him," the court ordered the clerk to order a "jury panel for the afternoon [session]."

At the afternoon session, the court announced it was going to hold a hearing to determine whether Eimer would still be testifying at trial given the nature of the recorded conversations between her and Ramos. Eimer's counsel informed the court that Eimer intended to assert her Fifth Amendment rights "not to incriminate herself in response to any questions regarding the incident that forms the basis of this case." When questioned by the court, Eimer confirmed that, upon advice of her counsel, she would refuse to answer any questions regarding the case. Although Ramos was provided an opportunity to question Eimer, she continued to exercise her Fifth Amendment rights. The court subsequently declared Eimer "unavailable" to testify, and excused her from the proceedings.

Following Eimer's excusal, Ramos requested a one-week continuance to allow him to "get in contact" with witnesses, and obtain clothing for trial. The court denied the

4

request, explaining that Ramos had refused to waive his right to a speedy trial, thereby requiring that the trial start that day. The court did, however, offer to bring in the jurors, and then order them to return the next day if Ramos would stipulate that the trial had begun that day "for all purposes." Ramos did not agree, and jury selection commenced.

The next morning, private attorney Ernest De La Mora appeared in court with Ramos, and requested that he be substituted in as counsel. The court told De La Mora that in light of Ramos's prior requests in the case, it would only allow De La Mora to substitute in as counsel if he was prepared to begin the trial that day. De La Mora stated that he could not do so because he was currently "engaged" in another trial. De La Mora then requested a continuance, explaining that Ramos's "Sixth Amendment right to have the counsel of his choice" outweighed any harm the State might suffer through the "dismiss[al] of one jury panel." The court denied the substitution, explaining that Ramos had previously insisted on his speedy trial rights, and assured the court he was ready to begin trial immediately.

After a recess, the district attorney asked the court to instruct Ramos not to make any comments in the jury's presence regarding the denial of his request for substitute counsel. The court agreed, admonishing Ramos that his "request for an attorney . . . to be substituted in is not part of this case. It will not be mention[ed]." The court further instructed Ramos that he would only be permitted to ask questions that were "legally appropriate," and that he would be "ordered to leave the court room" if he had any "outbursts."

The following morning, the court announced Ramos had absented himself from the proceedings due to abdominal pain. The court also stated that the medical staff had evaluated Ramos, and found nothing abnormal about his vital signs or physical appearance. When Ramos returned to the courtroom the next day, the court told him that, based on conversations with the jail medical staff, it had determined his decision to go to the infirmary was "an attempt to either inject error into the proceeding, get a continuance

5

or get a mistrial." The court instructed Ramos that if he engaged in such conduct again, the trial would move forward in his absence.[2]

The court then brought out the jury and commenced opening statements. As the district attorney began her opening statement, Ramos stated that he wanted "to address the court." After the court instructed Ramos there would be "time for that later," Ramos stated: "I'm not having a fair trial, your honor. I'm not ready. I need a lawyer to represent me. . . . I feel like this isn't fair." The court immediately ordered the jury to exit the room, and made the following statement to Ramos: "[Y]ou are gonna [sic] be excused from the courtroom now. That was a deliberate attempt to influence this jury. I believe you've been deliberately disruptive. You have articulated all those things while the jury was still in the courtroom in order to inject error or prejudice into these proceedings. . . . When you can comport yourself, we will ask you later on [sic]. For now, you will not be present. Take him out." The proceedings then resumed without the presence of defense counsel.

During Ramos's absence, the prosecution presented its opening statement and then called its first witness, Nancy Garcia. Nancy testified that at approximately 2:00 a.m. on the morning of July 12, 2012, she had been awoken by sounds of broken bottles and people arguing. Nancy looked outside her window and saw Ramos sweeping near the side of Eimer's house. Nancy tried to go back to sleep, but was kept awake by a continuing argument between Ramos and Eimer. Nancy did not fall asleep until 6:00 a.m.

The next afternoon, at approximately 1:00 p.m., Nancy exited her house to bring her garbage cans in from the curb. While walking down the driveway, she heard a voice say "Hey, Girl, What's up," and ask for her phone number. She then saw Ramos drinking a beer while sitting on a couch outside Eimer's house. Nancy ignored him, and

---

**2**    During this hearing, the prosecution informed the court it had obtained a recording of a conversation in which Ramos had said he was told to "pretend or act sick so that they can suspend the matter." The court noted that the recording provided further evidence that "Ramos was purposefully doing this in order to suspend the proceeding get a continuance or get a mistrial . . . . that was specifically what the intention was."

continued to bring in the trash cans.  Shortly thereafter, Nancy's sister Ruth also came outside.  As Nancy was pulling in the second trash can, Ramos got off the couch, approached her and said:  "Hey, Girl.  I'm talking to you.  What you think you are all that?  You think you're Shakira, that you're too good?"  He then said that Nancy was "not all that," and was "ugly."  Nancy asked Ramos to stop talking to her.  She also told him that next time he was having personal issues, he should take them somewhere else because he had kept her up all night.  Ramos became visibly angry, walked to within three to five feet of Nancy, and stated: "That's none of your business bitch"; "Who do you think you are?  This is my neighborhood.  This is not yours.  I'm from KWS13.  I could fuck you up bitch.  You need to mind your own fuckin [*sic*] business."

At that point, Eimer's roommate Maria came to the window of Eimer's house and apologized for Ramos's behavior, explaining he had been there all night and would not leave.  Maria stated that she and Eimer had called the police twice, but Ramos had run away when they arrived.  Maria also said she had not been able to take her kids to school because they were scared of Ramos.  Ramos then turned toward Maria, and yelled:  "It's none of her business.  That bitch needs to mind her own business. . . ."  He then told Nancy "I'm gonna fuck you up bitch."

Nancy testified that these comments made her feel scared because Ramos looked "so . . . angry," and had specifically mentioned his gang.  Nancy said she had previously seen Ramos with other people who she knew to be members of the gang "KWS."  She also stated that she had recently heard that a friend of Ramos's had raped a woman in a nearby building.  The prosecution showed Nancy a picture of a symbol that had been painted near her house.  She identified the mark as "KWS13," and explained that it referred to the gang in her neighborhood.

Nancy further testified that after Ramos had threatened her, he returned to the neighbor's window, put his hand through a hole in the screen and tried to grab Maria.  Maria pulled back, and began arguing with Ramos.  Nancy then looked up and saw a police officer approaching.  When she turned back toward Eimer's house, Ramos had fled the scene.

After the prosecution had completed its direct examination of Garcia, the court allowed Ramos to return to the courtroom and cross-examine the witness. Ramos remained in the courtroom during the testimony of the prosecution's other two witnesses. Ruth Garcia testified that she was with Nancy on the afternoon of July 12th, and had witnessed Ramos threaten Nancy. She also testified that she saw Ramos put his arm through the neighbor's open window, and appear to grab at someone standing inside. Los Angeles County Deputy Sheriff Victor Palacios testified that he had attempted to stop Ramos on the afternoon of July 12th, but he ran from police and then barricaded himself in a nearby apartment. Ramos was eventually taken into custody after a stand-off that lasted several hours. After completing the presentation of its witnesses, the prosecution read the jury Eimer's testimony from the preliminary hearing.

Ramos testified in his defense. He admitted that he was at Eimer's house on the afternoon of July12th, and that he had seen Nancy. He asserted, however, that he had not said anything to Nancy, and denied having been outside of Eimer's home earlier that morning. Ramos stated that he had left Eimer's house after seeing an officer drive by, and then returned to his apartment to take a nap. At some point later in the day, he was arrested in his apartment.

The jury found Ramos guilty on all three counts, and found the prior prison term allegation to be true. The court sentenced Ramos to an aggregate term of five years and four months in state prison. The court chose count three (criminal threats against Nancy Garcia) as the principal term, and selected the upper term of three years in prison. The court then imposed consecutive 16-month prison sentences on counts one and two (burglary and criminal threats against Eimer), but stayed the count two sentence under section 654. The court imposed an additional one-year term for the prior prison term finding. Ramos appealed the judgment.

### C. Post-trial Proceedings

During the pendency of Ramos's appeal, the Attorney General filed a motion requesting that this court conduct an in camera review of the personnel records of a Los Angeles County deputy sheriff who had spoken with one of the victims in this case

8

to determine whether any of the records qualified as discoverable information under *Brady v. Maryland* (1963) 373 U.S. 83. Alternatively, the Attorney General requested an order remanding the matter to the superior court for the in camera review. On May 8, 2014, we referred the matter to the superior court with a copy of the People's motion, and directed the court to conduct an in camera review of the relevant materials. During the ensuing in camera review, the trial court concluded that various documents in the officer's personnel records were subject to *Brady* disclosure requirements, and ordered that the Attorney General provide the documents to this court.

On August 8, 2014, we issued a "conditional[] revers[al]" of the judgment, and directed the trial court to "conduct additional proceedings to determine whether, in light of these developments, Ramos is entitled to a new trial." We further directed that if Ramos was "unable to show any prejudice based on the additional disclosures, the original appeal [would] be reinstated." Remittitur issued on October 8, 2014.

On remand, the trial court ruled Ramos was entitled to a new trial on counts one (burglary of Eimer's residence) and two (criminal threats against Eimer). On the date of the scheduled retrial, the district attorney announced it did not intend to retry Ramos on either count. The court then resentenced Ramos to four years in prison, which reflected the upper term of three years in prison, plus one year for a prison prior. Ramos was then discharged for time served. Ramos subsequently appealed his conviction on count three.[3]

## DISCUSSION

Ramos argues the trial court violated his Sixth Amendment rights when it involuntarily removed him from the courtroom without appointing standby counsel to represent him in his absence. He further contends the court's error is "reversible per se because [he] was denied the total assistance of counsel during critical stages of the trial." The Attorney General concedes the court erred when it "decided to remove [Ramos] from

---

[3]     Ramos's original appeal was assigned Case No. B248512. The appeal he filed following his resentencing on count three was assigned Case No. B267397. On December 21, 2015, we issued an order recalling our prior remittitur in case No. B248512 (filed October 8, 2014), and consolidated Case Nos. B248512 and B267397 under the number B248512.

the courtroom and allowed trial to proceed without appointing counsel." She argues, however, that: (1) the court's error is subject to "harmless error" analysis, and (2) the record conclusively shows that defendant's involuntary removal had no effect on the outcome of the proceedings.[4]

### A. *The Involuntary Removal of a Self-Represented Defendant From Trial Violates the Sixth Amendment Right to Counsel*

Before addressing whether the error that occurred in this case is subject to harmless error review, we must first determine the nature of the Sixth Amendment right at issue. A trial court's decision to involuntarily remove a self-represented defendant from trial without appointing substitute counsel implicates several Sixth Amendment rights, including "the right to be present at . . . trial" (*Illinois v. Allen* (1970) 397 U.S. 337, 338 (*Allen*); *People v. Blacksher* (2011) 52 Cal.4th 769, 798-799); "the right to counsel at all critical stages of the criminal process" (*Iowa v. Tovar* (2004) 541 U.S. 77, 80); and the "right to self representation." (*Faretta, supra*, 422 U.S. at p. 807.) Both parties' appellate briefs assume without discussion that because Ramos was self-represented, his involuntary removal from trial amounted to the denial of counsel during the period he was absent. This conclusion is consistent with several prior California decisions that have addressed the issue. (See *People v. Carroll* (1983) 140 Cal.App.3d 135 (*Carroll*) [involuntarily removal of a self-represented defendant from trial qualifies as a deprivation of the right to counsel, explaining that "excluding him as a defendant representing himself was a fundamental error requiring reversal, because there was, then, no defense counsel present"]; *People v. Soukomlane* (2008) 162 Cal.App.4th 214 (*Soukomlane*) [analyzing involuntary removal of self-represented defendant as a

---

**4** Ramos's appellate brief raises several additional arguments, contending that: (1) the court violated his Sixth Amendment right to choose counsel when it refused to allow De La Mora to substitute into the case; (2) the trial court violated his due process rights by instructing the jury that he had attempted to improperly influence the proceedings; and (3) there was insufficient evidence to support his conviction. Because we conclude the trial court's involuntary removal of Ramos during the prosecution's direct examination of Nancy Garcia requires reversal of the judgment, we need not address these additional arguments.

deprivation of the right to counsel]; *People v. El* (2002) 102 Cal.App.4th 1047 (*El*) [same].)

These authorities demonstrate that the involuntary removal of a self-represented defendant does more than simply violate his right to be present, which is based on the premise that a defendant's observations at trial may enable him to aid his attorneys in presenting his defense. (See *Faretta, supra*, 422 U.S. at p. 816 ["right to 'presence' [is] based upon the premise that the 'defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself'"].) Rather, as stated in *Carroll, supra*, 140 Cal.App.3d 135, "the removal [of a self-represented defendant] from the courtroom deprive[s] him not only of his own presence, but of legal representation."[5] (*Id.* at p. 141; see also *Mack, supra,* 362 F.3d at p. 601 [trial court's removal of self-represented defendant "left nobody to represent [the defendant]," and effectively "removed . . . his . . . counsel [with] nobody . . . [assigned to] fill the gap"].) We think it clear that when, as here, a defendant who has chosen to serve as his own counsel is involuntarily

---

[5]     Although it is well-established that a defendant can waive his Sixth Amendment right to be present through disruptive conduct in the courtroom (see *Allen, supra,* 397 U.S. at pp. 342-343), we are aware of no authority suggesting that a self-represented defendant can waive his right to legal representation or to present a defense by engaging in such conduct. In *Faretta, supra*, 422 U.S. 806, the Supreme Court explained that if a self-represented defendant chooses to engage in disruptive conduct in the courtroom, "the trial judge may terminate self-representation. . . . [A] State may – even over objection by the accused – appoint a 'standby counsel' to . . . be available to represent the accused in the event that termination of the defendant's self-representation is necessary." (*Id.* at p. 834, fn. 46.) The court's reasoning implies that while a disruptive self-represented defendant may well waive his right to be present or to represent himself in the proceedings, such conduct does not amount to a forfeiture of his right to legal representation. As succinctly stated by the Ninth Circuit: "A defendant does not forfeit his right to representation at trial when he acts out. He merely forfeits his right to represent himself in the proceeding." (*United States v. Mack* (9th Cir. 2004) 362 F.3d 597, 601 (*Mack*).)

11

removed from trial without the appointment of substitute counsel, he is necessarily deprived of the Sixth Amendment right to counsel during the period of his absence.

### B. *Reversal Is Required When Counsel Is Denied at a Critical Stage of Trial*

Having concluded that the error at issue in this case involved a deprivation of Ramos's right to counsel, we must next determine whether the error was prejudicial per se. "As a general matter, a defendant alleging a [violation of the] Sixth Amendment . . . [right to counsel] must demonstrate 'a reasonable probability that, but for [the error], the result of the proceeding would have been different.' [Citation.]" (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 (*Mickens*).) In *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*), however, the Supreme Court established "an exception to this general rule" (*Mickens*, *supra*, 535 U.S. at p. 166), explaining that reversal is required "if the accused is denied counsel at a critical stage of his trial." (*Cronic, supra,* 466 U.S. at p. 659.) "When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary." (*Mickens*, *supra*, 535 U.S. at p. 166.) The Court has reaffirmed this principle in several subsequent decisions. (*Roe v. Flores-Ortega* (2000) 528 U.S. 470, 483 ["'if the accused is denied counsel at a critical stage . . . . [n]o specific showing of prejudice is required'"]; *Mickens, supra,* 535 U.S. at p. 166 ["We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied . . . during a critical stage of the proceeding"]; *Bell v. Cone* (2002) 535 U.S. 685, 696; see also *Musladin v. Lamarque* (9th Cir. 2009) 555 F.3d 830, 837 ["*Cronic* specifically holds that automatic reversal is required where a defendant is denied counsel at a 'critical stage'"]; *Van v. Jones* (6th Cir. 2007) 475 F.3d 292, 311-312 (*Van*) [it is "settled that a complete absence of counsel at a critical stage of a criminal proceeding is a per se Sixth Amendment violation"].)

The California Supreme Court has likewise acknowledged the rule on multiple occasions, explaining that "'[a] complete denial of counsel at a critical stage of the proceedings' is sufficient to trigger the *Cronic* presumption of prejudice." (*People v. Banks* (2014) 59 Cal.4th 1113, 1169, overruled on other grounds in *People v. Scott*

12

(2015) 61 Cal.4th 363, 391 fn. 3; see also *People v. Benavides* (2005) 35 Cal.4th 69, 86 ["A complete denial of counsel at a critical stage of the proceedings, including during jury voir dire [citation], gives rise to a presumption that the trial was unfair"]; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1106 (*Hernandez*) [defendant asserting a Sixth Amendment claim has "the burden of establishing prejudice . . . unless the circumstances . . . render[] the adversarial process presumptively unreliable, such as where an accused is denied counsel at a critical stage of trial"]; but see *People v. Lightsey* (2012) 54 Cal.4th 668, 700-701 [mental competency hearing qualified as "critical stage" during which the complete denial of counsel required reversal, but indicating in dicta that there may be "limited situations . . . where the denial of counsel . . . for a discrete time . . . during a critical stage" might be "subject to harmless error review"].)

Given this total absence of counsel, and therefore any opportunity for "meaningful adversarial testing" of the prosecution's case, under the rule set forth in *Cronic*, we must presume prejudice if Ramos's removal occurred during a "critical stage of the trial." (*Hernandez, supra,* 53 Cal.4th at p. 1106 [under *Cronic*, prejudice is presumed where defendant's counsel is "unable to subject the prosecution case to meaning adversarial testing"].)

### C. Ramos Was Denied Counsel During a Critical Stage

The United States Supreme Court has indicated that "critical stages" are those "step[s] of a criminal proceeding . . . that hold[] significant consequences for the accused." (*Bell, supra,* 535 U.S. at p. 696.) The Court has not, however, provided a "comprehensive and final . . . definition of [the term].'" (*Van, supra,* 475 F.3d at p. 312; *McNeal v. Adams* (9th Cir. 2010) 623 F.3d 1283, 1286 ["The Court has not provided a list of *Cronic* critical stages"].) In the absence of any definitive guidance from the United States Supreme Court, courts have adopted a wide range of tests to determine whether a particular proceeding qualifies as a "critical stage." The Ninth Circuit, for example, has adopted a broad definition that applies to any "'proceeding where substantial rights of a criminal accused may be affected.' [Citations]." (*United States v. Benford* (9th Cir. 2009) 574 F.3d 1228, 1232 (*Benford*); *Hovey v. Ayers* (9th Cir. 2006) 458 F.3d 892, 901.)

The court has clarified that this definition includes, among other things, any proceeding that "'tests the merits of the accused's case." (*Benford, supra,* 574 F.3d at p. 1233.) Other courts have interpreted the phrase far more narrowly, concluding that "a presumption of prejudice [attaches] only with regard to those . . . stages of litigation where a denial of counsel would necessarily undermine the reliability of the entire criminal proceeding." (*Ditch v. Grace* (3d Cir. 2007) 479 F.3d 249, 256.)

Ramos was absent from the courtroom (and therefore without legal representation) during the prosecution's direct examination of Nancy Garcia, the alleged victim, who provided incriminating testimony against him. Even under the narrowest definition of the term, the examination of a percipient witness qualifies as a "critical stage" in the proceedings. Indeed, "it is difficult to perceive of a more critical stage of a trial than the taking of evidence on the defendant's guilt." (*Green v. Arn* (1987) 809 F.2d 1257, 1263 (*Green*) [vacated and remanded on other grounds, (1987) 484 U.S. 806, reinstated on remand, (6th Cir. 1988) 839 F.2d 300].) As stated by one jurist, "a lawyer's absence during substantial portions of testimony cripples his ability to cross-examine the witnesses and impairs his ability to present the defense case and jury arguments. . . . Surely the presentation of the evidence of guilt is a critical phase." (*Burdine v. Johnson* (5th Cir. 2011) 262 F.3d 336, 355 [conc. opn. of Higginbotham, J.]; see also *id*. at p. 349 [prejudice presumed where the absence of counsel occurred while prosecutor "was questioning witnesses and presenting evidence"]; see also *Green, supra*, 809 F.2d at p. 1263 ["The absence of counsel during the taking of evidence on the defendant's guilt is prejudicial per se"]; *United States v. Russell* (5th Cir. 2000) 205 F.3d 768, 772-773 [counsel's absence during trial testimony that implicated defendant's co-conspirators in underlying crime was reversible per se under *Cronic*]; *Mack, supra,* 362 F.3d 597 [requiring self-represented defendant to remain silent during presentation of evidence constituted a deprivation of counsel that was prejudicial per se] compare *Vines v. United States* (11th Cir. 1994) 28 F.3d 1123, 1128 [portion of trial during which "no evidence directly inculpating defendant [wa]s presented" did not qualify as "critical stage . . . within the meaning of *Cronic*"].)

The absence of legal counsel was particularly acute here given the nature of Garcia's testimony. To establish Ramos's guilt, the prosecution had to prove not only that he made threatening statements to Garcia, but also that his threats "actually caused" Garcia to be in "sustained fear for her own safety." (*People v. Toledo* (2006) 26 Cal.4th 221, 228 ["In order to prove a violation of section 422, the prosecution must establish all of the following . . . . (4) that the threat actually caused the person threatened 'to be in sustained fear for . . . her own safety'"].) Her testimony was therefore crucial to securing a conviction. Without having heard or observed this testimony, Garcia had no ability to conduct an effective cross-examination of the prosecution's most important witness. (See *Davis v. Alaska* (1974) 415 U.S. 308, 318 ["deni[al] . . . of effective cross-examination [is] a constitutional error of the first magnitude [that] no amount of showing of want of prejudice [can] cure . . . ."].) In light of these circumstances, we think it clear that Garcia's testimony was a "critical stage of the trial," and that the complete absence of counsel during her testimony "'render[ed] [the] trial fundamentally unfair.'" (*Neder v. United States* (1999) 527 U.S. 1, 8.) Ramos is therefore entitled to reversal of his conviction without analysis for prejudice or harmless error.

Our conclusion is in accord with three prior California decisions that have addressed a similar question. In *Carroll, supra,* 140 Cal.App.3d 135, which predates *Cronic, supra,*, 466 U.S. 648, the trial court removed a self-represented defendant from his murder trial after he ignored repeated warnings to stop requesting appointed counsel in the presence of the jury. The defendant remained absent during jury selection, and the prosecution's examination of a medical expert who testified to the cause of the victim's death. The defendant was then brought back into the courtroom, and allowed to question the witness. The defendant immediately requested appointed counsel, and was again removed. Additional witnesses testified in his absence, including a neighbor who had found the victim's body, and the victim's son. The trial court then invited the defendant back in to the courtroom, and he remained present for the rest of the trial.

The appellate court found that "under the circumstances of [the] case, the involuntary exclusion from the courtroom of a defendant who was representing himself,

15

without other defense counsel present, was fundamental error requiring reversal without regard to prejudice." (*Carroll, supra*, 140 Cal.App.3d. at p. 142.) The court clarified that its decision was not intended to provide "defendants a tool by which they can exercise their rights . . . to represent themselves and then become disruptive, securing their exclusion from the courtroom and automatic reversal. Other alternatives exist. The trial court may, for example, find that defendant is no longer able to represent himself and appoint counsel. It has been suggested that contempt proceedings may be taken against a defendant in a proper case, or that a defendant may remain in the courtroom under some restraint. [Citation.] In the present case, no alternative other than excluding defendant was attempted." (*Id*. at p. 142.) The court also emphasized that its decision was not "base[d] . . . on error by the trial court in deciding that this defendant's behavior merited his exclusion from the courtroom. [¶] A defendant who is represented by counsel may be excluded from the courtroom for disorderly or disruptive behavior, or, in a trial for an offense not punishable by death, the trial may continue if defendant is voluntarily absent. [¶] . . . [¶] We base our holding on the fundamental error in . . . excluding a defendant acting as his own counsel from the courtroom without the presence of counsel for the defense . . . ." (*Id*. at pp. 143-144.)

*Soukomlane, supra,* 162 Cal.App.4th 214, involved similar circumstances. The defendant in *Soukomlane* elected to represent himself after having been charged with willful infliction of corporal injury on his spouse. At trial, the defendant repeatedly interrupted the prosecution's examination of his wife (the victim of the alleged crime), causing the court to order his removal. (*Id.* at p. 227.) After the wife had completed her testimony on direct, the court allowed the defendant to return to the courtroom, cross-examine the witness and participate in all other aspects of the trial. On appeal, the defendant argued that his involuntary removal during "the prosecutor's examination of a key witness against him" was prejudicial per se. (*Id*. at p. 233.) The Attorney General conceded error, but argued the court should apply harmless error review. (*Id*. at p. 235.)

The appellate court elected not to resolve the question, concluding that the error was reversible even under the harmless error standard. The court explained that it could

16

not predict the effect of the "defendant's absence from part of the prosecutor's examination of a critical witness. . . . [The defendant] and his wife were the sole percipient witnesses to the events before the 911 call and the arrival of police. We decline the Attorney General's tacit invitation to substitute our reading of a reporter's transcript for a *Faretta* defendant's hearing and seeing all of the complexities, nuances, and subtleties (with reference to content and credibility alike) of the prosecutor's examination of the only other percipient witness to the events at the heart of the charge against him. [¶] Since we cannot declare our belief that the denial of [defendant's] constitutional right to counsel was harmless beyond a reasonable doubt, we will reverse the judgment on that ground. We need not address the question whether the error requires reversal per se." (*Soukomlane*, *supra*, 162 Cal.App.4th at p. 235.)

In *El, supra,* 102 Cal.App.4th 1047, however, the court held that a self-represented defendant's involuntary removal during a portion of the prosecution's opening statement was not prejudicial per se "because the . . . error left [defendant] unrepresented for only a brief time." (*Id*. at p. 1050.) Citing *Rushen v. Spain* (1983) 464 U.S. 114 (a case decided before *Cronic*), the court explained that "anything less than the complete denial of the right to counsel is subject to harmless error analysis. . . . '[V]iolations of the right to be . . . represented by counsel . . . as with most constitutional rights, are subject to harmless error analysis. . . .' [Citation.]" (*Id*. at p. 118.) The court noted that unlike in *Carroll*, the appellant "did not miss any testimony, and was allowed to cross-examine witnesses. His absence from the courtroom amounted to only five pages' worth of the prosecutor's opening argument. As the denial of his right to counsel was less than total, harmless error analysis applies." (*El*, *supra*, 102 Cal.App.4th at p. 1051.) The court further concluded that the record showed defendant's absence had no effect on the proceedings: "[The defendant] missed only the prosecutor's unadorned summary of the elements of the charged offenses and the evidence proving those elements. . . . Nothing in the prosecutor's assertions was objectionable and her workmanlike argument scored against appellant no more damage than that already inflicted by the state of the evidence." (*Ibid.*)

17

Our conclusion that Ramos is entitled to a new trial is consistent with all three of these cases. As in *Carroll* and *Soukomlane*, Ramos was excluded from the courtroom while the prosecution elicited incriminating witness testimony against him. *Carroll* concluded that such an error was "fundamental" in nature, requiring automatic reversal. (*Carroll, supra,* 140 Cal.App.3d at p. 141.) *Soukomlane* reached a similar conclusion, holding that the absence of counsel during the prosecution's examination of a key witness could not be deemed harmless because it was impossible to predict how the error may have affected the proceedings. *El*, in contrast, addressed the absence of counsel during a substantially different stage of the proceedings: the prosecution's opening statement. In reaching its holding, the court emphasized that the prosecution had not presented any evidence while the defendant was removed from the courtroom. That is not the case here.

The Attorney General acknowledges that the absence of counsel at a critical stage of the proceedings is prejudicial per se, and that "[u]nder ordinary circumstances, the direct examination of a key witness constitutes a critical stage of the trial." She argues, however, that we should nonetheless apply harmless error in this particular case because Ramos engaged in a "premeditated plan to undermine the proceedings [that] makes him at fault for his own removal." The Attorney General has cited no legal authority supporting the proposition that the defendant's conduct in the courtroom is relevant to determining whether an erroneous denial of counsel is subject to automatic reversal. Rather, the case law summarized above makes clear that the determination whether the denial of counsel is prejudicial per se turns on the nature of the proceeding during which the Sixth Amendment violation occurred. If counsel is denied at a "critical stage" in the proceedings (as occurred here), reversal is required regardless of whether the defendant's misconduct may have contributed to the error.

To the extent the Attorney General is suggesting that Ramos's disruptive behavior in the courtroom, which lead to his involuntary removal from trial, should be treated as if he had voluntarily absented himself, we reject that contention. Where an out-of-custody, self-represented defendant voluntarily absents himself from the proceedings, the court is

18

entitled, but not required, to treat his right to be present to defend himself as waived, and may proceed with trial in his absence. (*People v. Espinoza* (2016) 1 Cal.5th 61, 72.) Such an implied waiver may be found where the defendant is aware that the trial will continue in his absence, that he has the right to be present and that he had "no sound reason for remaining away." (*Id.* at p. 74; see also *Carroll, supra*, 140 Cal.App.3d at p. 144 [trial may continue in the absence of a self-represented defendant "where defendant clearly chooses to represent himself and then clearly, voluntarily, and on the record, refuses to participate in his trial"].)

The same conclusion—voluntary waiver—cannot be drawn where a defendant, like Ramos here, does not make a knowing choice to remove himself, but is instead involuntarily removed by the court. The Attorney General cites no authority supporting that proposition. In those circumstances, if the removal, and consequent denial of representation occurs at a "critical stage" in the proceedings (as occurred here), reversal is required regardless of whether the defendant's misconduct may have contributed to the error.[6]

## DISPOSITION

The judgment is reversed, and the case is remanded for retrial.


ZELON, Acting P. J.

We concur:


SEGAL, J.                    GARNETT, J.[*]

---

[6]    As explained above (see *ante*, at p. 11, fn. 5), to the extent a self-represented defendant chooses to engage in disruptive conduct during trial, the court retains discretion to terminate self-representation and appoint substitute counsel.

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.